UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

THE ESTATE OF JOSHUA D. ANDERSON, et al.,

        Plaintiffs,

    v.                                                     Case No. 15-C-124

WISCONSIN MUNICIPAL MUTUAL
INSURANCE COMPANY, et al.,

        Defendants.

**DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

      This is an action for damages arising out of the alleged failure to provide appropriate mental health care and treatment to Joshua D. Anderson during his confinement at the Brown County Jail. Anderson was confined in the jail from November 1, 2013, when he was placed in the jail on a probation hold, to January 20, 2014, when he was transferred to the Brown County Treatment Center. He died in a nursing home less than a year later. Anderson's Estate and minor child (Plaintiffs) filed this action pursuant to 42 U.S.C. § 1983 against Brown County, which owns and operates the jail; the County's insurer, Wisconsin Municipal Insurance Company; Lieutenant Phillip Steffen, who was a jail supervisor; Kristin Nutter, Anderson's probation officer; and Jeremy Donath, her supervisor; Family Services of Northeast Wisconsin, which contracts with the County to provide certain mental health services; and Tana Koss, a supervisor at Family Services. Plaintiffs claim Anderson was subjected to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article I, § 6 of the Wisconsin Constitution. Plaintiffs also assert claims of false imprisonment in violation of Anderson's rights under the Fourth

Amendment, negligence and various statutory violations. In a previous decision, the court dismissed the claims against Anderson's probation officer and her supervisor. The case now comes before the Court on the remaining defendants' motions for summary judgment. (ECF Nos. 47, 67.) For the reasons that follow, summary judgment will be granted in favor of Family Services, Koss, and Lt. Steffen. The County's motion will be denied.

## FACTUAL BACKGROUND

Mental health care and treatment in Wisconsin is governed by Chapter 51 of the Wisconsin Statutes. Chapter 51 authorizes counties to establish hospitals or facilities for the detention and care of mentally ill persons, alcoholics and drug addicts. Wis. Stat. 51.09. Mentally ill individuals in need of treatment may consent to voluntary admission to such facilities, subject to several statutory safeguards. *Id.* § 51.10. Alternatively, individuals who are mentally ill and dangerous to themselves or others may be involuntarily committed to such facilities for care and treatment, in both non-emergency and emergency situations. *Id.* § 51.20. In non-emergency situations, proceedings to involuntarily commit a person for mental health care and treatment are initiated when three adults, at least one of whom has knowledge of the subject's dangerous conduct, file a signed petition with the court. *Id.* § 51.20(1)(b). The court must review the petition within 24 hours of filing. *Id.* § 51.20(2)(a). If the court determines that the person is mentally ill and eligible for commitment based on his recent conduct, it issues an order of detention. *Id.* In emergency situations, a law enforcement officer may take a person into custody if the officer has cause to believe that the person is mentally ill and poses a substantial risk of physical harm to himself or others. *Id.* § 51.15(1)(ag). But even where a law enforcement officer has cause to believe that a person meets the requirements of the statute for emergency detention, the officer can only transport

the person to a facility if the county department of community programs approves the need for detention and for evaluation, diagnosis and treatment. *Id.* § 51.15(2). If a jail cannot provide the necessary mental health care and treatment for inmates, the statute authorizes transfer of the inmate to state mental health facilities. *Id.* § 51.37.

Family Services provides various mental health related services to Brown County under a contract with the Brown County Department of Human Services. (ECF No. 81-1.) The services Family Services performs under its contract with the County include making referrals for mental health services and providing counseling and support for people in crisis and/or contemplating suicide. Family Services offers short-term counseling for people of all ages throughout Brown and other counties 24 hours a day, 7 days a week. Under its agreement with Brown County, Family Services also performs the evaluations required for emergency detentions under § 51.15. Without Family Services' approval, law enforcement may not transport an individual to a mental health treatment facility for emergency detention.

At all times relevant to the facts of this case, Brown County contracted with Health Professionals, Ltd., (HPL) and/or Correctional Healthcare Companies (CHC) to meet the health care needs, including mental health care needs, of the inmates and detainees of the Brown County Jail. The HPL contract provided for medical and mental health services, including 56 hours per week of registered nursing services, 85 hours per week of licensed practical nursing services, 4 hours per week of physician services, 3 hours per week of psychiatric services, 40 hours per week of director of nursing services, 40 hours per week of medical records clerical services, 4 hours every other week of dentist services, and 4 hours every other week of dental assistant services. In addition to

3

these services, the contract provided for on-call physician and/or nursing services 24 hours per day, 7 days a week. (ECF No. 86 ¶ 11.)

In May 2013, Joshua Anderson was admitted to the Brown County Mental Health Treatment Center (BCTC) after his mother called the police stating Anderson threatened to cut himself with a box cutter. Police disarmed Anderson and, with the approval of Family Services, transported him to BCTC pursuant to Wis. Stat. § 51.15 on an emergency detention. During the transport, police also confiscated some marijuana Anderson admitted using, which formed the basis of possession of THC and possession of drug paraphernalia charges issued by the Brown County District Attorney in July. On August 26, 2013, Anderson appeared in court without counsel and entered a guilty plea to the misdemeanor possession of marijuana charge. Sentence was withheld, and Anderson was placed on one (1) year probation and ordered to complete ten (10) hours of community service. In October, Anderson was again admitted to the BCTC on an emergency detention, again approved by Family Services, after police determined he was a danger to himself. This time, his detention lasted four days.

At the same time, likely due to his mental condition, Anderson did not comply with the conditions of his probation. More specifically, it appears he failed to report to his agent as directed. Anderson was released from the BCTC on October 15, 2013. On October 17, 2013, his probation agent issued an apprehension request for him. Anderson was taken into custody on November 1, 2013, and placed in the Brown County Jail.

During Anderson's booking, he exhibited strange and unresponsive behavior, resulting in his placement in special housing. Viewing the evidence in the light most favorable to Plaintiffs, it was clear as early as November 21, 2013, if not earlier, that the jail was unable to meet Anderson's

4

mental health needs. (ECF No. 60 ¶ 3.) Michelle Dahlke, the HPL mental health professional, noted that Anderson had been virtually non-verbal and unresponsive almost from the first time she attempted to see him on November 4, 2013. She repeatedly wrote N/A [not applicable] in the section of her reports for assessment and plan because Anderson was essentially non-responsive. (ECF No. 73-10.) By November 21, she documented that Anderson had eaten a plastic bag and other items, including milk cartons, plastic forks, and his smock. He refused to wear clothes and had been placed on suicide watch. Dahlke, with the assistance of Lt. Steffen, repeatedly attempted to contact Anderson's probation agent in an effort to release him from jail so he could get the care and treatment he needed, but as noted in the Court's decision granting the State defendants' motion to dismiss, the agent did not return her calls and then went on an extended leave of absence. Dahlke also contacted Family Services and requested approval to transfer him to the BCTC on an emergency detention pursuant to Wis. Stat. § 51.15.

When Dahlke initially contacted Family Services by phone on November 21, she was told that based on her description of his condition Anderson did not meet the requirements for Emergency Detention under § 51.15. Lt. Steffen then called Family Services and asked that someone be sent to the jail to assess him face-to-face. A counselor came to the jail and met with Anderson, but reached the same conclusion. She concluded that Anderson did not meet the emergency detention qualifications on November 21, 2013, because

> 1.) Josh [Anderson] has not attempted suicide in the past 24 hours. 2.) He denied current suicidal ideations. 3.) Josh did not disclose any plan to harm himself. 4.) Josh was able to contract for his safety. 5.) Josh was calm and cooperative in answering counselor's questions. 6.) He has been eating and sleeping regularly. 7.) Josh is in a supervised environment. 8.) His cell appeared clean at this time. 9.) Josh was oriented to person, place, and time.

Thompson Aff. 56–57, ECF No. 55.

Anderson's bizarre behavior continued. Along with his other eating habits, he ate items that he picked up off the floor of his cell where he frequently urinated. Anderson was placed in a safety cell after expressing suicidal ideations. (ECF No. 50-5 at 19.) After a second assessment on November 28, 2013, Family Services again declined to approve an emergency detention because: "1. Joshua was able to contract for his safety. 2. Joshua denied having a plan to end his life. 3. Joshua had not attempted to harm himself. 4. Joshua would remain in a monitored environment at the Brown County Jail." Thompson Aff. 52–54 (ECF No. 55.)

On December 3, 2013, Dahlke noted that Anderson was "still very confused and eating things he shouldn't. Still having odd behavior and not talking to staff." (ECF No. 73-10 at 10.) Dahlke did not believe that Anderson "was fit to stay in jail at this time." (*Id.*) She again called Family Services to ask about emergency detention, but was told he did not meet the requirements because he was not in imminent danger and the jail can keep him safe. (*Id.*)

On December 9, 2013, Dahlke tried to talk with Anderson at the door of his cell but it appeared he did not understand her and would give only yes or no answers. Dahlke encouraged Anderson to stop eating paper and urine-soaked objects he found on the floor of his cell. Anderson seemed to agree but then immediately began eating paper when she stepped away. Dahlke noted that Anderson had not showered in a month and was using his shower as a toilet. She again contacted Lt. Steffen to see if there was anything they could do to get him out of the jail since he was unable to meet his needs of caring for himself. (ECF No. 73-10 at 12.)

On December 26, 2013, Anderson was observed standing naked in his shower with a severely distended stomach. His uniform had been taken away because he continued trying to eat it. He was also still eating other foreign objects, including objects that fell on the floor where he

6

urinated. He had only a blank stare and was unable to answer questions. The Health Services Unit (HSU) had Anderson transported to the hospital where he was diagnosed with a bowel obstruction, treated and returned to the jail the same day. (ECF No. 73-11.) The following day, Dahlke met with Anderson but he would only answer her questions "ya." The correctional officers reported that he continued to eat things he shouldn't, including items soaked in urine. Dahlke again contacted Family Services, but the person she talked to declined to send anyone to assess Anderson because he was not in imminent danger and the jail could keep him safe. (ECF No. 73-10 at 16.)

On January 13, 2014, Family Services performed a third emergency detention assessment of Anderson. Again denying Anderson an emergency detention, a Family Services employee wrote:

> 1. Josh appeared to understand writer's questions. 2. was oriented and 3. had been eating and drinking and 4. was taking his medications as prescribed. 5. He has been responding to jail staff commands or requests and 6. is connected to mental health psychiatric services at the jail and has an appointment on 01.14.2014. 7. Josh denied hallucinations and did not appear to be responding to internal stimuli. 8. Josh, at this time, was not a danger to himself or others. 9. Josh was in a restricted setting with 24 hour monitoring.

Thompson Aff. 49, ECF No. 55. Mental health professionals continued meeting with Anderson and he continued to exhibit the same unhealthy eating and sanitation habits.

On January 20, 2014, a mental health professional at the Brown County Jail contacted Family Services and informed them that Anderson was eating feces and urine-soaked bologna. Without an in-person assessment, Tana Koss authorized Anderson's emergency detention over the phone. Anderson was then transferred from the Brown County Jail to the Brown County Treatment Center (BCTC). Am. Compl. ¶ 60.

To some extent, Anderson's condition improved upon being moved to the BCTC. Anderson bathed and was placed on one-on-one supervision. (ECF No. 50-7.) He stayed compliant with his

7

medications in the BCTC and his diet improved. Because Anderson was a diabetic, the BCTC monitored his blood sugar—something the jail did not previously do. However, Anderson continued to engage in many of the same activities that had caused him so much harm in the Brown County Jail. *Id.* He still ate non-food items and urinated and defecated in his room and shower. *Id.* By January 28, 2014, Anderson exhibited no improvement. Anderson continued to be unresponsive at times and stared blankly at BCTC staff. He ate paper towels and cups and tried to eat a cotton ball, his blanket, and an old band-aid. He engaged in "rectal digging," attempted to put fingers in his mouth, and continued to try to eat toilet paper. At times, employees at the BCTC placed Anderson in a restraint chair.

After Anderson's condition and behaviors failed to improve in the BCTC, a CT scan was performed on February 12, 2014. (ECF No. 50-7 at 1.) The scan revealed frontal lobe atrophy. *Id.* Based on these results, Anderson was removed from the BCTC and placed in the Brown County Nursing Home on March 4, 2014. *Id.* at 4. Anderson continued to exhibit many of the same kinds of behavior at the Nursing Home. Anderson passed away in the Nursing Home on December 25, 2014.

## ANALYSIS

**A. Summary Judgment Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460–61 (E.D. Wis.1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See*

*Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, the court will view the facts in the light most favorable to the non-moving parties. *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004).

**B. Brown County**

Plaintiffs assert a *Monell* claim against Brown County, alleging that Anderson was subjected to cruel and unusual punishment in violation of the Eighth Amendment as the result of the County's policy of denying inmates inpatient mental health care absent a determination that the inmate meets the requirements for emergency detention under Wis. Stat. § 51.15. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978). "A plaintiff may demonstrate an official policy through: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007); *see also King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 20121). This is a direct form of liability, "not founded on a theory of vicarious liability or respondeat superior that holds a municipality responsible for the misdeeds of its employees." *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203, 103 L. Ed. 2d 412 (1989)). To be liable for an unconstitutional policy, "[t]he municipal policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation, which a plaintiff may show directly by demonstrating that the policy is itself unconstitutional." *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010).

Brown County Policy "H14 Commitment and/or Transfer of Inmates to a Mental Health Facility" (H14) governs the transfer of inmates from the Brown County Jail to mental health facilities such as the BCTC. H14 states in part that: "It shall be the Policy of the Brown County Jail to ensure that inmates with apparently serious mental or emotional problems receive proper care, such inmates may be referred for commitment to a state mental health facility, under the provisions of Chapter 51, Wisconsin Statutes." Brown County Policy H14 1, ECF No. 92-1. Under "General Information" the policy goes on to state: "Sworn officers only, under Wi. Stats 51.15 can initiated [sic] emergency detention although jail mental health worker or a designee may provide jail staff with any requested consultation and assistance in initiating commitment proceedings." *Id.* The policy then contains a discussion of the procedure for emergency detention under § 51.15. *Id.* at 1–5.

By its terms, H14 does not preclude jail officials from utilizing § 51.10, which authorizes voluntary admissions, § 51.20, which authorizes non-emergency mental health commitments, or § 51.37, which specifically addresses transfers of jail inmates to state mental health facilities in order to obtain necessary mental health care and treatment for inmates that the jail cannot provide. But it provides no information or instructions about how to invoke these other procedures for transferring inmates to mental health institutions so that they can receive inpatient care. The only reference to §§ 51.20 and 51.37 is in paragraph 10 of the policy, which requires the Jail Administrator to annually report the number of transfers or commitments it had under those sections to the Department of Corrections. (ECF No. 92-1 at 5.) And because the policy did not include any discussion of these alternative procedures for getting an inmate inpatient mental health care, no one at the jail appears to have been aware of them.

10

Based on the undisputed evidence before the Court, a reasonable jury could find that the jail staff's implementation of the H14 policy resulted in Anderson not being transferred to BCTC until a sufficient emergency arose to satisfy the demands of § 51.15. This continued despite the recognition of Ms. Dahlke and Lt. Steffen that the jail could not provide the kind of constant care and supervision that Anderson required. In the meantime, Anderson continued to abuse himself without receiving adequate medication, supervision, or assistance with his hygiene. Had the Brown County Policy authorized involuntary commitment of inmates pursuant to § 51.20 or transfers of inmates pursuant to § 51.37, Anderson could have been taken to BCTC or a State institution much sooner. As such, a jury could conclude that the H14 policy was the moving force and direct cause of these harms to Anderson, who was apparently unable to control his own conduct. I therefore conclude that Plaintiffs have made an adequate showing to sustain a *Monell* claim against Brown County. The County's motion for summary judgment will be denied.

**C. Lt. Steffen**

Plaintiffs allege that Lt. Steffen was deliberately indifferent to Anderson's serious risk of harm while at the Brown County Jail. "To establish deliberate indifference, a plaintiff must present evidence that an individual defendant intentionally disregarded the known risk to inmate health or safety." *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006). This is and was meant to be a "high hurdle" for plaintiffs. *Id.* As the Seventh Circuit has previously held, non-medical prison administrators are entitled to rely on and defer to medical personnel, so long as they do not ignore an inmate's plight. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

The undisputed facts in this case indicate that Steffen had only limited involvement in Anderson's stay in the Brown County Jail. Those same facts also show, however, that Steffen was

11

not deliberately indifferent to Anderson's serious medical needs. Steffen clearly realized that Anderson needed additional assistance, writing on January 13, 2014 to Assistant Corporation Counsel Rebecca Lidner: "I am at a loss for words. . . . We've had Josh Anderson seen numerous times by Crisis. [He does] not belong in our custody under [his] current condition. . . . We are very frustrated. . . . [He] should have been [transferred away] weeks ago. . . . We really could use your assistance on this." (ECF No. 50-6.) Steffen's actions are even more telling. Throughout Anderson's time at the Brown County Jail, Steffen reached out to probation agents, corporate counsel, jail mental health professionals, and Family Services for help with Anderson's situation. At no point did Steffen "ignore" Anderson's plight. Rather, the record shows that Steffen took action—within the bounds of the H14 policy as he understood it—each time he was presented with information or a request for assistance regarding Anderson. Accordingly, Steffen's actions do not rise to the level of deliberate indifference and Plaintiffs' claims against him must be dismissed.

**D. Family Services and Koss**

    **1. Deliberate Indifference of Family Services and Koss**

Plaintiffs state that they have no objection to Family Services and Koss' motion for summary judgment on Plaintiffs' claim for deliberate indifference. Pls.' Br. In Opp. 6–7, ECF No. 53. As to Family Services, Plaintiffs concede that respondeat superior is not applicable to deliberate indifference claims under § 1983, even for private entities contracting with governmental bodies. Similarly, based on the relevant facts and law, Plaintiffs believe that they are unable to sustain a deliberate indifference claim against Koss individually. Therefore, Plaintiffs' deliberate indifference claims against Koss and Family Services will be dismissed.

12

### 2. *Monell* Liability of Family Services

Plaintiffs set forth two arguments that Family Services may be liable under *Monell* for injuries to Anderson that resulted from its policies or practices. First, Plaintiffs contend that there is no statutory support for Family Services' policy of only ordering emergency detentions under Wis. Stat. § 51.15. According to Plaintiffs, Wis. Stat. § 51.20 provides the appropriate means for detaining an inmate on an emergency basis. Second, Plaintiffs argue that the way Family Services' policy was enforced caused unnecessary pain and suffering to inmates, including Anderson. Plaintiffs would have Family Services lower the threshold for emergency detentions to the minimum required by the law in order to more liberally approve emergency detentions. By ordering emergency detentions in more circumstances, Family Services would be able to mitigate situations (like the one Anderson faced) by getting the mentally ill into treatment more quickly.

The undisputed evidence establishes, however, that it was not Family Services' policy that kept Anderson in the Brown County Jail even after it became apparent that the County did not have the appropriate resources to care for Anderson. Family Services' had the role of determining whether or not the § 51.15 standards had been satisfied. The agency was not responsible for giving Anderson any actual medical care. Moreover, Family Services' determination that Anderson did not meet the requirements of § 51.15 for emergency detention did not mean he could not receive the care he obviously needed. The Jail staff remained free, with the assistance of the County's attorneys, to pursue involuntary commitment under § 51.20 or seek a transfer to a State facility with the Department of Corrections pursuant to § 51.37. Because these other options existed, any policy of Family Services cannot have been the "direct cause" or "moving force" behind any violation of

13

Anderson's constitutional rights. *See Minix*, 597 F.3d at 832. Therefore, Plaintiffs' *Monell* claim against Family Services must be dismissed.

### 3. Negligence

Plaintiffs also assert that Family Services was negligent in failing to approve Anderson's emergency detention under § 51.15 earlier. Family Services argues that it is entitled to summary judgment on this claim because Family Services has immunity pursuant to § 51.15(11). Wis. Stat. § 51.15(11) states:

> Any individual who acts in accordance with this section, including making a determination that an individual has or does not have mental illness or evidences or does not evidence a substantial probability of harm . . . is not liable for any actions taken in good faith. The good faith of the actor shall be presumed in any civil action. Whoever asserts that the individual who acts in accordance with this section has not acted in good faith has the burden of proving that assertion by evidence that is clear, satisfactory and convincing.

Thus under Wisconsin law actors who approve a detention pursuant to § 51.15 are entitled to a presumption of good faith that can only be overcome by clear, satisfactory, and convincing evidence. The Wisconsin Legislature has made this decision, recognizing that the decision about whether to make an emergency detention is an "inexact science." *Estate of Hammersley ex rel. Hammersley v. Wisconsin Cty. Mut. Ins. Corp.*, 2012 WI App 44, ¶ 14, 340 Wis. 2d 557, 563, 811 N.W.2d 878, 881.

Here, Plaintiffs have not overcome the presumption of good faith that guards Family Services from a negligence claim. Indeed, Plaintiffs only argue that Family Services wrongfully interpreted and implemented § 51.15, not that Family Services failed to act in good faith. Therefore, Plaintiffs' negligence claim must also be dismissed.

14

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants Family Services and Tana Koss' motion for summary judgment (ECF No. 47) is granted. Plaintiffs' claims against Koss and Family Services, are dismissed.

**IT IS FURTHER ORDERED** that Defendants Brown County, Lt. Phillip Steffen, and Wisconsin Mutual Insurance Company's motion for summary judgment (ECF No. 67) is granted in part and denied in part. The motion is granted as to the claim of deliberate indifference against Lt. Steffen, and that claim is dismissed. Summary judgment is denied with respect to Plaintiffs' *Monell* claim against Brown County and its insurer. The case remains on the Court's calendar for trial.

Dated this   24th   day of August, 2016.

    s/ William C. Griesbach
William C. Griesbach, Chief Judge
Eastern District of Wisconsin